IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 7 |
| BILL A. VORHES, | ) | |
| | ) | Bankruptcy No. 16-01577 |
| Debtor. | ) | |
| | ) | |
| DAVID A. SERGEANT, as | ) | |
| Chapter 7 Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No. 17-09001 |
| | ) | |
| v. | ) | |
| | ) | |
| S&V TRUST, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| S&V TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID A. SERGEANT, as | ) | |
| Chapter 7 Trustee, VORHES LTD., | ) | |
| LYNN KINGERY, as executor for | ) | |
| the Bernice Gill Estate, and | ) | |
| LINCOLN SAVINGS BANK, as | ) | |
| executor for the Irene Vorhes estate | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

**RULING ON S&V TRUST'S THIRD-PARTY COMPLAINT AND S&V
TRUST'S MOTION TO STRIKE**

This matter came on for trial on April 21, 2017 in Cedar Rapids.  Chad

Swanson and Dan Childers appeared for Lynn Kingery as executor of the Bernice

Gill estate ("Ms. Kingery").  Tom Lawlor appeared for Lincoln Savings Bank as

executor of the Irene Vorhes estate ("LSB").  Ron Martin, Joe Day, and Aaron

Blair appeared for Jean Westendorf as Trustee of S&V Trust ("S&V Trust").  Eric

Lam appeared for Chapter 7 Trustee David Sergeant.  Pat Vickers appeared for

Vorhes Ltd.  The Court heard testimony and evidence.  The parties filed briefs.

Although their counsel appeared at trial, neither the Chapter 7 Trustee nor Vorhes

Ltd. offered evidence, made argument, or filed briefs.

After the briefs were filed, S&V Trust filed a motion to strike portions of

LSB's brief.  The Court held a hearing on that motion on May 25, 2017 and took it

under advisement with the matters from trial.  These are core proceedings under 28

U.S.C. § 157(b)(2).

## STATEMENT OF THE CASE

This case is about the ownership of stock in Vorhes Ltd., a family farm

company.  In particular, the Court is called on to determine whether Bill Vorhes

(Chapter 7 Debtor) owns any of the stock and, if so, how much.  The parties

disagree about who is a shareholder and, in turn, who owns and/or controls how

many shares.  In determining who is a shareholder, the parties disagree about

whether two transactions, with respect to that stock, were effective.  The first

involves an alleged transfer of stock by Bill to a trust he purported to establish

called S&V Trust.  The second involves the alleged cancellation of some shares of stock by Vorhes Ltd.

The Court is also asked to resolve the issue of whether Vorhes stock that was specifically devised in the will of the family matriarch, Irene Vorhes, remains in Irene's estate, or whether it automatically transferred to her children, including Bill, by operation of a statutory deadline under Iowa law.  For the following reasons, the Court concludes the Bill Vorhes bankruptcy estate owns shares he attempted to transfer to S&V Trust, and the Irene Vorhes' share of stock remained in her estate at the time relevant to the issues before this Court.

## FINDINGS OF FACT

Vern and Irene Vorhes were married and had four children:  Bill Vorhes; Pete Vorhes; Jean Vorhes Westendorf; and Bernice Vorhes Gill.  Vern, Irene, and Bernice have all passed away and the estates of Irene (through LSB) and Bernice (through Lynn Kingery) are involved in this case.

In 1979, Vern and Irene created Vorhes Ltd. ("the company") as an Iowa corporation for their family farming operation.  Vern and Irene owned 20,000 shares in the company.  During the 1980s, the four Vorhes children each received 2,121 shares of stock in the company through a series of gifts from Vern and Irene. After these transactions, Vern owned 5,758 shares, Irene owned 5,758 shares, and each child owned 2,121 shares.

3

When Vern died, his will provided that his 5,758 shares be split between his four children, subject to a life estate in favor of Irene.  Irene died on December 11, 2010 and her life estate in Vern's 5,758 shares terminated.  As a result, Vern's 5,758 shares were divided equally between Bill, Jean, Bernice, and Pete, under the terms of Vern's will.  Thus, each of the four Vorhes children then owned 3,560.5 shares consisting of the 2,121 they received previously plus 1,439.5, their quarter share of Vern's 5,758.

Irene's will specifically devised the 5,758 shares she owned to be divided between Bill, Jean, and Bernice.  Pete was not included because he had previously agreed with the company to surrender all of his shares back to the company — including his shares from Vern — in exchange for some company farmland.  Pete now has no stock or interest in the company and is not a part of the company or this dispute.

In January 2011, Bernice and Jean were appointed co-executors of Irene's estate.  In April 2011, Bill became President of Vorhes Ltd.  Jean became Vice President and Treasurer.

On September 7, 2011, Bernice brought a shareholder derivative action on behalf of the company in Iowa District Court for Floyd County.  Bernice argued that Bill owed the company hundreds of thousands of dollars on a number of

4

personal loans he took and for use of the company's farmland that he did not pay for.

On March 11, 2013, while the shareholder derivative litigation was still pending, Bill created the S&V Trust. The S&V Trust "Declaration of Trust" itself has some threshold problems. For example, it references an oil and gas lease, as well as a $1 million loan from Jean. The S&V Trust, however, has no interest in oil or gas leases and Jean has not loaned money to S&V Trust. Bill set up the S&V Trust with the assistance of Marvin Pullman, a non-lawyer. Mr. Pullman has since been found to have been engaged in the unauthorized practice of law in Iowa and has been permanently enjoined from doing so anymore.

Bill made himself general manager of S&V Trust. He made Jean a Trustee of S&V Trust. Bill's grandchildren, Blake Vorhes and Elias Vorhes, are the only specified beneficiaries of S&V Trust. The S&V Trust is not court-supervised.

Bill testified that he transferred 2,121 of his shares of Vorhes Ltd. to S&V Trust when he created it. Bill testified that the 2,121 shares are S&V Trust's only asset. Bill does not claim he transferred 3560.6 of shares, which is the 2,121 shares plus the 1,439.5 shares from Vern Vorhes. Bill claims all Vern and Irene stock shares were cancelled by the company.

Bill did not give Vorhes Ltd. any written notice of his transfer of Vorhes Ltd. stock to S&V Trust. Bill also did not receive written consent from the other

5

Vorhes Ltd. shareholders to make the transfer.  Bill also claims that he also

transferred a $700,000 or $800,000 debt that he owed to Jean to the S&V Trust.

Bill testified that S&V Trust now owes Jean that money and he does not.

On March 20, 2013, there was a Vorhes Ltd. shareholder meeting.  The

minutes from that meeting show that Bill did not have actual possession of his

shares that he allegedly transferred to S&V Trust.  The minutes indicate Bill was

going to contact Bernice to get the shares out of a lockbox.  Bernice eventually got

the certificates and gave them to Jean or Bill.  Jean assisted Bill with the attempted

transfer to S&V.  Jean testified that the certificates issued to S&V Trust were

backdated to March 11, 2013 because Bill did not have actual possession of the

certificates at the time he transferred them to S&V Trust.  The original certificates

for Bill's shares, however, have no notation indicating that they are no longer

valid.

After his purported March 2013 transfer to S&V Trust, Bill continued to

attend Vorhes Ltd. meetings as a shareholder and voted his shares.  Bill and Jean

claim Bill was attending under his authority as General Manager of S&V Trust,

and voting the S&V Trust shares he had transferred.  No documentation supports

that assertion.  The only relevant documents are the minutes from those meetings.

The minutes never mention S&V Trust or show that Bill attended Vorhes Ltd.

meetings as General Manager for S&V Trust.  The minutes reference Bill only as

himself and show he votes his shares.  Bill asserts now that there was no reason to

talk about the stock being in S&V Trust because "everyone knew" how he had set

things up.

Vorhes Ltd. held another shareholder meeting on June 8, 2013.  Jean claims

that at that meeting all three of the shareholders agreed to "cancel" — or "retire"[1]

— all the share they received from their parents — the 5,758 from Vern and the

5,758 from Irene.  Jean claimed this avoided the hassle of issuing new shares,

which was not necessary.  She noted each shareholder already owned an equal

number of shares (2,121).  By cancelling shares, she argues the value of their

shares simply increased equally because it reduced the total number of outstanding

shares.  Bill claims he, Jean, and Bernice all agreed to retire the shares at this

meeting.  The executor of Bernice's estate, her daughter Lynn Kingery, does not

agree that this occurred.

The minutes from the June 8, 2013 meeting show that Bill, Jean, and

Bernice all attended.  The minutes, however, say nothing about an agreement to

cancel or retire shares of stock.  Jean claims that the secretary taking notes did not

write it down but they all agreed.  Jean admitted that there is no written document

showing Bernice agreed to cancel or retire the shares.

---

[1] The parties used both "cancel" and "retire" at the hearing, but, in this case, they
mean the same thing: transferring the shares to the company, thereby reducing the
number of outstanding shares and increasing the value of outstanding shares.

At some point, Jean wrote "retired non-voting stock" across the front of Irene's and Vern's stock certificates.  Jean was not secretary of the company when she wrote this.  Adding to the confusion, the back of the shares say they were transferred to the company and that new shares were issued to the company.  It is undisputed, however, that new shares were never issued to the company.

In July 2013, Vorhes Ltd. answered interrogatories in the derivative action Bernice brought against Bill and the company.  Interrogatory 12 from Bernice asked for the names of all parties who owned stock in the company and Vorhes Ltd. answered that Bernice, Jean, and Bill were the stockholders.  The answer does not mention S&V Trust.  Bill testified that he told the company attorney at the time that S&V Trust owned the stock, not him.  The answer to Interrogatory 1, however, states that Bill and Jean were the ones answering and giving assistance in answering the interrogatories.  When confronted with this fact, Bill testified that he had never seen the document before.

The trial on Bernice's shareholder derivative suit took place in April 2014. Jean testified at the trial.  When questioned about who owned stock in the company, Jean agreed that Bill, Jean, and Bernice each owned one third.  Jean did not mention S&V Trust, even though she now claims she was a Trustee of S&V at that time.

On February 7, 2015, Jean and Bernice were removed as co-executors of Irene's estate. LSB was appointed executor of the estate. LSB remains executor of Irene Vorhes estate. Julie Versluis works for LSB and was assigned to manage the estate. She testified at trial of this matter currently before the Court. She testified that Irene's 5,758 shares (allegedly cancelled) are still in the possession of LSB for Irene's estate, along with a $300,000 note from the company and $1000 cash. Irene's estate still had possession of Irene's 5,758 shares because LSB had seen no documents showing that Bernice, who was a co-executor, agreed to transfer the shares out of the estate. Versluis further testified that LSB needed to retain Irene's 5,758 shares to fulfill its duties as executor to pay the estate's debts and costs of administration. She testified that she does not know how much the costs of administration ultimately will be because the administration is ongoing. Costs are based on the value of estate assets and the stock has not been valued.

On April 6, 2015, the Judge Foy issued a written ruling on Bernice's shareholder derivative suit. He entered judgment against Bill for unpaid loans from Vorhes Ltd. and rent totaling $462,581.70, along with attorney's fees. Judge Foy gave Bill the option of either paying the judgment by July 31, 2015, or returning Vorhes Ltd. shares equal to the value of the judgment to the company as payment. Judge Foy also prohibited Bill from voting any shares or serving as an officer of Vorhes Ltd.

Vorhes Ltd. held a shareholder meeting on April 6, 2015. Bill appeared at that meeting and, contrary to Judge Foy's order, voted shares. Bill did not appear as General Manager for S&V Trust nor did he purport to be voting S&V Trust's shares. Ms. Versluis attended that meeting as executor for Irene's estate. Bill and Jean were present, but Bernice was not. The minutes do not show that Bill or Jean objected to Ms. Versluis' attendance at that meeting, indicating further that Irene's shares had not be cancelled, but were instead under control of LSB.

On July 15, 2015, there was another purported Vorhes Ltd. shareholder meeting. Before the meeting, there was a dispute about when the shareholders should hold a meeting. Ms. Versluis sent an email before the meeting stating that Irene's estate was the majority shareholder and objecting to the meeting for a number of reasons. Lynn Kingery, representing the estate of Bernice, responded to that email agreeing that the meeting should not go forward.

Bill and Jean held a meeting anyway. Only Bill, Jean, and Karen Powers, company secretary, were at this meeting. The minutes of the July 15, 2015 meeting say "Shareholders present were Bill Vorhes and Jean Westendorf. Shareholders absent were Bernice Gill and Julie Versluis, LSB, executor for Irene Vorhes' estate." There is no mention of S&V Trust. There also is no indication that Irene's shares had been cancelled or LSB should not attend for Irene's estate.

The meeting minutes state that Bill attended that meeting as a shareholder and voted shares, again contrary to Judge Foy's order. The minutes say nothing about Bill purporting to vote S&V Trust shares. Jean and Bill voted to make Bill president of the company at the meeting. Bill reported at that meeting only that he was considering selling some of **his** shares in the company to pay debt. Bill also signed a Notice of Termination of Farm Tenancy on behalf of Vorhes Ltd. In his own handwriting, he signed as himself and described himself as a shareholder of the company.

On October 1, 2015, Bernice brought contempt proceedings against Bill. She alleged that Bill had violated the terms of Judge Foy's order. She alleged specifically that Bill continued to attempt to vote his shares and act as an officer of the corporation, even though he had not paid the judgment entered against him.

In October 2015, Bernice died and her daughter, Lynn Kingery, became executor of her estate. The Bernice Gill estate holds shares of the company but Ms. Kingery testified that, because of the present dispute, she could not say for certain how many shares are in the estate. Ms. Kingery became president of Vorhes Ltd. in January 2016 and has remained president since.

On January 8, 2016, Judge Foy held a hearing on Bernice's application to find Bill in contempt for violating Judge Foy's order. Bill testified at that hearing. He admitted that he had participated at company meetings and voted **his** shares.

11

When asked about his participation and voting as a shareholder, he never stated that he was attempting to vote S&V Trust's shares.  In fact, while there were many more questions about his ownership of the company and his actions in voting shares, he never even mentioned S&V Trust, his alleged role as General Manager of S&V Trust, or that he transferred his shares to S&V Trust.  This testimony is nearly an admission by Bill that he continued to own company shares in his name, contrary to his present claims before this Court.

On February 22, 2016, Judge Foy issued an order finding Bill in contempt of the Iowa District Court.  Judge Foy found that Bill did not follow the previous order.  Bill had not paid the judgment or returned his shares to the company.  Bill also continued to vote his shares in the Vorhes Ltd. and act as an officer of the company.  Judge Foy found Bill did all of these things in direct violation of Judge Foy's previous order.  As a result, Judge Foy found Bill in contempt of court and expressly stated that if he did not pay the judgment or return his shares to the company, he would be sentenced to 20 days in jail and fined $350.

When confronted with the facts from the State Court contempt proceeding in the trial before this Court, Bill simply said that he did not remember the state court contempt hearing.  Bill appeared to admit, however, that March 2016 was the first time he alleged in any public forum that S&V Trust owned the shares since 2013, and not Bill himself.

12

Bill filed Chapter 7 bankruptcy on December 15, 2016.  His schedules show that he does not own any company stock.  The Chapter 7 Trustee filed an adversary seeking to avoid any alleged transfer Bill claims to have made of 2,121 shares to S&V Trust as a fraudulent transfer.  S&V Trust filed a third-party complaint seeking a determination of the number of outstanding shares, the ownership of the shares, and whether Bill's Chapter 7 bankruptcy estate owns any shares.  This Court held a trial only on S&V Trust's third-party complaint, not the Chapter 7 Trustee's fraudulent transfer case.

After trial, the parties filed briefs.  On May 17, 2017, immediately after briefs were submitted, S&V Trust filed a motion to strike portions of LSB's brief.  The Court held a hearing on that motion on May 25, 2017.  S&V Trust argued some attachments and statements within the LSB brief contained evidence not offered or admitted at the trial.  S&V Trust argued that the Court should not consider the documents.  LSB argued that it was not offering the documents it attached to its brief as evidence, but were simply providing context for the arguments.  The Court took that question under advisement with the matters raised at trial.  The Court now denies the motion to strike, but will not consider any of the brief as evidence.  Even if the Court were to grant the motion to strike, it would not change the ruling in any way.

## ARGUMENTS

The disputes here are:  (1) whether Bill's alleged transfer of his Vorhes Ltd. stock to S&V Trust on March 11, 2013 was effective; (2) whether there was agreement between all the Vorhes Ltd. shareholders to cancel or retire Vern's and Irene's shares on June 8, 2013; and (3) whether Irene's estate properly had possession of 5,758 shares at the relevant times to this case.

S&V Trust argues that Bill did not own any Vorhes Ltd. shares when he filed bankruptcy.  It argues that he transferred his 2,121 shares to S&V Trust on March 11, 2013.  It argues that Vern's shares and Irene's shares—which went to Bill, Jean, and Bernice by operation of law—were retired by agreement of the shareholders on June 8, 2013.  It also argues that LSB could not still own or control Irene's shares as they were cancelled because they were delivered to the shareholders by operation of Iowa law.  On the basis of these arguments, S&V Trust concludes that Bill does not own any shares of Vorhes Ltd., that there are currently 6,363 shares of stock, and S&V Trust, Jean, and the Estate of Bernice Gill each own 2,121 shares.

Ms. Kingery, as executor of Bernice Gill's estate entirely disagrees with S&V Trust.  She argues that Bill's attempted transfer of his 2,121 shares to S&V Trust was not effective because it did not follow corporate requirements.  She argues Bill and Jean have continued to act as though no S&V transfer occurred.

14

She also argues that there is no credible evidence that all shareholders agreed to cancel or retire the stock from Vern and Irene at the June 8, 2013 meeting.

LSB agrees with Ms. Kingery that the Irene's shares were never cancelled. LSB argues Irene's shares were not transferred by operation of Iowa law.  LSB argues it retained possession of this specific bequest for cause because it must still pay estate debts and the costs of administration.

LSB and Ms. Kingery agree that there are currently 16,439.5 shares outstanding.  They argue that the current ownership of outstanding stock is as follows: Bill owns 3,560.5 shares; Jean owns 3,560.5 shares; the Estate of Bernice Gill owns 3,560.5 shares; and the Estate of Irene Vorhes has possession of 5,758 shares.

## CONCLUSIONS OF LAW AND ANALYSIS

The Court will address the parties' arguments in the following sections.

### I.    S&V Trust

S&V Trust argues that stock transfer it received from Debtor is valid under Paragraph 7 of the Stock Purchase and Redemption Agreement.  That paragraph has been referred to as the "related shareholder" transfer.  It provides that any shareholders can transfer to "a Trustee for the exclusive benefit of . . . one or more of his children."  This paragraph further provides that it "shall override any by-law in conflict with any provisions of this Agreement."  S&V Trust argues that the

intent of the section is to authorize transfers to "relatives" and that Bill's transfer to

S&V Trust for the benefit of his grandchildren is such a transfer.  S&V Trust

argues that Vern and Irene intended to create Vorhes Ltd. for the maintenance and

ownership of the farm as a family operation and that S&V's interpretation of

Paragraph 7 furthers that intent.

The Bernice Gill Estate argues that Bill created S&V Trust for the benefit of

his grandchildren, not children, and Paragraph 7 does not apply.  The Bernice Gill

Estate argues simply that because Bill's transfer to S&V Trust was for the benefit

of his grandchildren, it does not meet the express and clear terms of Paragraph 7

addressing a transfer to "for the exclusive benefit of . . . one or more of his

**children.**"

"It is well established that the law of the state of incorporation should

determine issues relating to a corporation's internal affairs."  In re Uno Broad.

Corp., 167 B.R. 189, 196 (Bankr. D. Ariz. 1994).  This is an Iowa corporation.

Iowa law provides that "[t]he articles of incorporation, bylaws, an agreement

among shareholders, or an agreement between shareholders and the corporation

may impose restrictions on the transfer or registration of transfer of shares of the

corporation."  Iowa Code § 490.627.  Such restrictions are "valid and enforceable

against the holder or a transferee of the holder if the restriction is authorized by this

16

section and its existence is noted conspicuously on the front or back of the

certificate . . . ." Id.

"In general, the articles of incorporation and bylaws create a contractual

relationship between the parties." Oberbillig v. W. Grand Towers Condo. Ass'n,

807 N.W.2d 143, 149 (Iowa 2011) (internal quotation marks omitted).

Accordingly, Iowa courts "apply the general rules for contracts to construe a

corporation's governing documents." Id. "Under the cardinal rule of contract

construction, the parties' intent controls." Lange v. Lange, 520 N.W.2d 113, 119

(Iowa 1994). **"Except where ambiguity exists, intent is determined by what

the contract itself says."** Id. (emphasis added) "In interpreting a contract, we

give effect to language of the entire contract in accordance with its commonly

accepted and ordinary meaning." Id.

"An ambiguity exists only if the language of the exclusion is susceptible to

two interpretations." Bituminous Cas. Corp. v. Sand Livestock Sys., Inc., 728

N.W.2d 216, 222 (Iowa 2007) (internal quotation marks omitted). "[A] contract is

not ambiguous merely because the parties disagree over its meaning." Hartig Drug

Co. v. Hartig, 602 N.W.2d 794, 797 (Iowa 1999). The Court "may not refer to

extrinsic evidence in order to create ambiguity," id., or "rewrite bylaws in the guise

of interpretation." Oberbillig, 807 N.W.2d at 151. "When a contract is not

ambiguous, [courts] are obliged to enforce it as written." Lange, 520 N.W.2d at 119.

Here, Vorhes Ltd. is incorporated in Iowa. The company's by-laws specify that no transfer of stock will be valid until 90 days after the company receives written notice of the proposed sale and has an opportunity to purchase the shares during those 90 days. On the front of each certificate of company stock, it says: "This stock certificate is subject to a by-law restricting its transfer." In addition, Paragraph 3 of the Stock Purchase and Redemption Agreement says no transfer is effective until after the shareholders give their written consent or the transferring shareholder offers to sell to the company or the other shareholders.

It is essentially undisputed that the alleged transfer from Bill to S&V Trust was not completed in accordance with these provisions. Bill and Jean admitted during trial that they did not follow these requirements for a valid transfer of company stock. The 90-day notice period for a March 11, 2013 transfer would have started December 12, 2012. Bill never gave notice nor was there a company meeting held around this time. No written notice was ever provided. No shareholder meeting minutes show any consent was ever sought or given. Bill's attempted transfer simply did not comply with the company bylaws or with Paragraph 3 of the Stock Purchase and Redemption Agreement.

18

S&V Trust instead argues that the transfer from Bill was valid as a "related shareholder" transfer under Paragraph 7.  S&V Trust, with support from Bill and Jean, argued that the language in Paragraph 7 addressing "children" should also be read to include "grandchildren."   The Court rejects this argument.  The "commonly accepted and ordinary meaning" of words controls.  <u>Lange</u>, 520 N.W.2d at 119.  Under that standard, this Court concludes "children" does not include "grandchildren."  In the context of interpreting a will, the Iowa Supreme Court has held that, the term "children" does not include "grandchildren" in Iowa, "unless from the context of the will such appears to be the plain intent of the testator."  <u>In re Fintel's Estate</u>, 239 Iowa 475, 481, 31 N.W.2d 892, 895 (1948).

S&V Trust argues that the intent behind Paragraph 7 was to enable transfers to all related family members.  The Court need not even address that argument because the provision is not ambiguous.  Even if the Court did consider it, there is no evidence to support S&V Trust's assertions about the intent of Paragraph 7.  Bill's testimony that "children" includes "grandchildren" is his understanding of that paragraph, nothing more.  It does not show that Irene and Vern intended that reading at the time they prepared the documents.  The Court finds Bill's testimony on this issue unpersuasive.

19

Bill's testimony simply does not create an ambiguity where the language is clear. The term "children" is clear, and it does not include grandchildren. The Iowa Supreme Court has essentially rejected the exact same argument that "children" includes "grandchildren." <u>Lange</u>, 520 N.W.2d at 119. The Court must enforce the agreement as written.

Contracts and documents are interpreted based on "the words chosen." <u>Walsh v Nelson</u>, 622 N.W.2d 499, 503 (Iowa 2001). Irene and Vern could easily have chosen the words "children, grandchildren, and other family members" if they wanted to express their broad inclusion of family as S&V Trust argues. They did not do so. Their actual choice of words is controlling. Bill's attempted transfer of Vorhes Ltd. stock to S&V Trust did not meet the requirements of Paragraph 7 and was barred by other applicable provisions of company documents. Bill remained in possession of those 2,121 shares of Vorhes Ltd., and they have become part of his bankruptcy estate.

A strong preponderance of the evidence, in fact, shows that Bill did not even believe he had properly made the stock transfer to S&V. Bill's own actions and statements in the years since purportedly attempting to transfer the stock to S&V Trust in March 2013 are perhaps the strongest evidence against him. Bill continued to vote his shares as if they were his. The Vorhes Ltd. meeting minutes repeatedly show that Bill owned and voted the shares. There was never a mention

20

of S&V Trust at all — let alone that it was controlling or voting shares. The ruling on the shareholder derivative suit and the ruling finding Bill in contempt of court show that Bill owned and owns the shares, not S&V Trust. In his testimony before the state court, Bill never claimed that S&V Trust owned the shares despite having multiple opportunities and incentives to make such a statement. This Court does not find Bill's later self-serving testimony on these issues persuasive.

Bill claims that "everyone knew" he had made the transfer and that he was voting as General Manager of S&V Trust so it was not necessary to document it in the meeting minutes. This assertion rings hollow in light of the strong evidence to the contrary. Similarly, his claim that he did not know anything about the interrogatory answer in the derivative action that lists him, not S&V Trust, as a shareholder is simply not credible and certainly is not persuasive. Even the transactions purporting to create the S&V Trust are highly questionable given the involvement of Marvin Pullman. All these facts brings Bill's motivation in creating the S&V Trust and his attempted transfer of his shares to S&V Trust into serious question. In sum, all this evidence supports the Court's finding that Bill did not properly transfer any of his shares of stock in Vorhes Ltd. to S&V Trust. Those shares are now part of his bankruptcy estate.

Case 17-09001   Doc 38   Filed 06/16/17   Entered 06/16/17 14:21:13   Desc Main
Document   Page 22 of 29

## II.   Cancellation or Retirement of Shares

S&V Trust also argues that Vern's 5,758 shares and Irene's 5,758 shares were cancelled or retired at the June 8, 2013 Vorhes Ltd. shareholder meeting. S&V Trust argues that all of the shareholders—Bill, Jean, and Bernice—agreed to cancel or retire the stock at this meeting.  S&V Trust argues this cancellation effectively constituted a distribution of the value of the cancelled shares to Bill, Jean, and Bernice.  It reasons that, because those three were the only shareholders, the value of the shares would increase equally as other shares were eliminated.

LSB points out that Irene's shares could not have been cancelled because it had possession and control of them when Bill and Jean claim to have voted to cancel or retire them.  Even if Bill, Jean, and Bernice already had possession of Vern's shares, Irene's estate remained the single largest shareholder and had no notice of — and could not consent to — the cancellation.  Moreover, the Estate of Bernice disputes Bill and Jean's assertion that Bernice agreed to such a cancellation.  Thus, Bernice and LSB (on behalf of Irene) could have simply out-voted Bill and Jean on the question if it had been properly presented.

Ms. Kingery disagrees with S&V Trust's argument for a similar, but slightly different, reason.  She argues that the minutes from the June 8, 2013 Vorhes Ltd. meeting do not show any cancellation agreement or action.  She also argues that, before cancellation or retirement can be affective, the shares at issue must first be

transferred back to the company — which never occurred. She argues that such a transfer would require written documentation from the shareholders that they transferred the disputed shares. No such document exists. Ms. Kingery notes that, even if 100% of the shares were represented at this June 8, 2013 shareholder meeting, there is simply no persuasive evidence in the record that the shareholders actually voted to cancel or retire shares at the June 8, 2013 meeting.

S&V Trust argues, in response, that a written agreement to cancel shares is not required under the company's corporate documents. S&V Trust argues that the words "retired non-voting stock" written across stock certificates shows that the shareholders agreed to cancel the stock on June 8, 2013. S&V Trust argues that the meeting minutes are not conclusive with respect to what actually occurred at the meeting.

S&V Trust's assertions are contrary to Iowa law properly applied here. Selley v. Am. Lubricator Co., 93 N.W. 590 (Iowa 1903) (Corporate meeting minutes presumptively show actions taken at the meeting "but this presumption is not conclusive, and it may be shown by evidence [illuminating] what the directors in fact did."); Iowa Drug. Co. v. Souers, 117 N.W. 300 (Iowa 1908) ("[I]t is well settled that parol evidence is admissible to show formal action of a board of directors to have been in fact taken, although no record thereof is found in the minutes of its meetings."). Under this authority, the Court finds there was no

shareholder agreement on cancellation or retirement of Irene and Vern's shares at the June 8, 2013 meeting. Minutes from meetings presumptively control. The minutes from the June 8, 2013 meeting do not even mention cancelling or retiring shares, let alone a shareholder agreement to do so. On its face, this indicates no such cancellation or retirement occurred. Such a major action surely would be recorded in even the most cursory recording of the meeting's events.

The only evidence in the record that the shareholders agreed to cancel the stock was the testimony of Bill and Jean. This included the explanation of Jean's handwriting on the subject stock certificates. The Court does not find their testimony on this issue to be credible.

Instead, the Court finds the actions of Bill and Jean since the June 8, 2013 meeting more accurately show shares were not cancelled or retired at that meeting. Since the June 8, 2013 meeting, Bill and Jean have never objected to LSB claiming possession of Irene's shares. On April 6, 2015, Ms. Versluis attended a Vorhes Ltd. meeting for LSB as executor for Irene's estate. Neither Bill nor Jean objected. In an email exchange, Ms. Versluis stated that the Irene Vorhes Estate was the majority shareholder of the company. Jean never disputed this statement. On July 15, 2015, there was a disputed shareholder meeting that only Bill and Jean attended. However, the minutes from that meeting specifically describe "Julie Versluis, LSB, executor for Irene Vorhes' estate" as an absent "shareholder." If

Bill and Jean really believed they properly cancelled the shares of Irene, surely

they would have objected to representatives of Irene being present at meetings or

statements about Irene's estate holding the largest number of shares.  They also

surely would not have described LSB as executor for Irene's estate and

shareholder, if they had cancelled those shares.

Jean's handwriting on the shares is far from conclusive evidence of what

happened at the June 8, 2013.  Her handwriting on the certificates does not show

that (1) Bernice agreed to cancel the shares or (2) that any such agreement occurred

on June 8, 2013.  There is no document showing Bernice's agreement to cancel

shares.  In light of the Court's finding on the lack of credibility of the testimony of

Bill and Jean, the fact that the meeting minutes do not mention cancelling shares,

and Bill and Jean's actions since that meeting, the Court finds Jean's handwriting

on the shares insufficient to show a valid cancellation or retirement of shares.  In

sum, the Court concludes that there was no agreement by Vorhes Ltd. to cancel or

retire Vern's or Irene's shares at the June 8, 2013 meeting.

### III. Current Possession of Irene's 5,758 shares

S&V Trust attempts to get around the problem of Vorhes Ltd. not having

possession of Irene's stock by arguing that LSB failed to deliver specifically

devised property (Irene's shares) within nine months from the date of LSB's

appointment as executors.  Iowa Code § 633.355.  S&V argues LSB's failure to

25

comply with § 633.355 means that the shares were transferred automatically by operation of Iowa law.  Thus, S&V Trust argues that LSB did not properly have title, possession, or control of any stock in Vorhes Ltd. in June 2013.

S&V Trust argues Irene's will provided a "specific devise" of her stock.  It argues LSB did not receive a court order entitling it to continue possession of the shares beyond the presumed 90-day period.  S&V Trust concludes that, without such court order, the shares were automatically delivered to Bill, Jean, and Bernice by operation of Iowa law.  Thus, it concludes the shareholders at the June 8, 2013 meeting could have cancelled (and in fact did cancel) the stock of Irene.

S&V argues that Iowa Law in effect at the time of Irene's death was clear and provided:

> Unless the court, for cause shown, determines that the possession of the personal representative shall continue for a longer period, the personal representative shall deliver all specifically devised property to the devisees entitled thereto after the expiration of nine months from the date of appointment of the personal representative.

Iowa Code § 633.355.  "[Iowa] courts have consistently held that the term shall in a statute [creates] a mandatory duty, not discretion."  Braunschweig v. Bd. of Supervisors, 707 N.W.2d 338, 2005 WL 2989763, at *3 (Iowa Ct. App. 2005) (internal quotation marks omitted) (alternation in original).  S&V further points out that where an executor retained possession of farmland past the time Iowa Code § 633.355 required him to deliver it; judgment was properly entered against the

26

executor for the estate's damages for his continued possession past the deadline.

In re Estate of Anderson, 781 N.W.2d 303, 2010 WL 796925, at *2. (Iowa Ct.

App. 2010).

Ms. Kingery and LSB disagree with S&V's reading of law given the facts

here. They first argue that Irene's shares were not distributed through cancellation

at the June 8, 2013 meeting. Thus, they argue that no action, nor operation of Iowa

law, could render them cancelled. They also rely on In re Estate of Franzkowiak v.

Wenschel, 290 N.W.2d 1 (Iowa 1980) to support their position that Iowa Code

§ 633.355 does not automatically deliver property at the 90-day deadline. The

section allows for a showing of "cause" to retain such property. Id. LSB asserts

that "cause" exists because it needed to retain possession in order to pay estate

debts and costs of administration.

This issue was largely or entirely mooted by the determination in the

previous section that no cancellation of Irene's stock ever occurred. To the extent

it was not fully resolved by those determinations, the Court addresses it now. A

court may find "cause" to extend the § 633.355 deadline even after an executor has

already retained property past the deadline. In re Estate of Franzkowiak, 290

N.W.2d at 6. This Court finds "cause" here to justify LSB retaining possession of

Irene's 5,758 shares past the 90-day period. There was a continuing need to assess

and pay the outstanding expenses of the Irene Vorhes estate, including attorney

fees.  The fact that the shares of Vorhes Ltd. were tied up in litigation complicated

the matter further because the value of the shares was hard to establish.  However,

whether that cause existed into 2014, 2015, or beyond remains an open question.

The Court concludes only that "cause" existed in June 2013 for LSB to retain

possession and control of Irene's stock in Vorhes Ltd.

S&V Trust appears to argue that the duty imposed by § 633.355 is actually

an automatic transfer by operation of Iowa law and "cause" cannot be made out

"after the fact."  Under S&V Trust's argument, it would be impossible for an

executor to violate that 90-day duty, because delivery by operation of Iowa law

would automatically occur.  As noted in In re Estate of Franzkowiak, 290 N.W.2d

at 6, the Iowa Supreme Court found cause for an executor to retain property past

the deadline, even though the deadline had already passed.  If S&V is correct that

§ 633.355 operated automatically, then Franzkowiak could not have been decided

as it was.  The property would have already left the estate and been delivered by

operation of Iowa law.  In short, the Court finds S&V Trust's argument

unpersuasive and inconsistent with Iowa case law.

The Court repeats that it makes no finding on whether there is currently

"cause" under § 633.355 for LSB to continue to retain the shares.  The Court only

finds that § 633.355 did not automatically cause Irene's 5,758 shares to be

delivered to the devisees by June 8, 2013.  Thus, cancellation or retirement of her

stock was not effective (even if attempted) because Vorhes Ltd. and its

shareholders did not possess the stock.

## CONCLUSION

The Court finds that there are currently 16,439.5 shares of company stock

outstanding: Bill owns 3,560.5 shares; Jean owns 3,560.5 shares; the Estate of

Bernice Gill has possession of 3,560.5 shares; and the Estate of Irene Vorhes has

possession of 5,758 shares.  When Bill filed bankruptcy, his 3,560.5 shares became

a part of his bankruptcy estate.

**WHEREFORE**, judgment is entered on S&V Trust's Third-Party

Complaint in accordance with this ruling.

**FURTHER**, S&V Trust's Motion to Strike is DENIED.

Dated and Entered:
June 16, 2017

_____

THAD J. COLLINS
CHIEF BANKRUPTCY JUDGE